IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF TWO BLACK APPLE IPHONES, TWO SILVER APPLE IPHONES, AND A WHITE APPLE IPAD MINI, CURRENTLY LOCATED IN SECURE EVIDENCE AT THE ROCKINGHAM COUNTY SHERIFF'S OFFICE, 101 NORTH ROAD BRENTWOOD, NEW HAMPSHIRE | Case No. 21-mj- 117-01-AJ<br><br>**FILED UNDER SEAL, LEVEL II** |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION FOR A SEARCH WARRANT**

I, Michael J. Lecuyer, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—the above-captioned electronic devices seized from the vehicle and residence of the Target Jacob Chambers ("CHAMBERS") on March 24, 2021, currently in the possession of law enforcement—and the extraction from that property of electronically stored information described in Attachment B.

2. I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

3. I have been employed as a Special Agent of the United States Drug Enforcement Administration ("DEA") since 2007. In 2007, I attended and graduated from the DEA's Basic Agent Academy in Quantico, Virginia. The DEA Basic Academy included comprehensive, formalized instruction in, but not limited to: basic drug investigations; drug identification,

detection, and interdiction; familiarization with United States drug laws; financial investigations and money laundering; identification and seizure of drug related assets; organized crime investigations; physical and electronic surveillance; and undercover operations. Upon completion of that Academy, I was assigned to the DEA McAllen District Office, in McAllen, Texas, where I performed investigative duties in the field of drug enforcement until 2011, when I was assigned to the Boston Division Office of DEA's New England Field Division ("NEFD"). In 2013, I was assigned to the Manchester District Office in Bedford, New Hampshire where I am currently assigned as the NEFD Clandestine Laboratory Team Coordinator. In that capacity, I am responsible for managing each DEA Clandestine Laboratory Team within the six States that comprise the NEFD. I have also taught thousands of state, local, county, and federal law enforcement officers in clandestine laboratory awareness safety courses throughout the United States and Internationally.

4. Prior to my employment with the DEA, I was a police officer in the State of New Hampshire for approximately six years, during which time my duties included investigation of both drug and non-drug related offenses. In 2003, I received a Bachelor of Science degree in Business Administration from the University of New Hampshire.

5. During the course of my employment with the DEA, I have received specialized training regarding the activities of drug traffickers and various aspects of drug investigation, including the methods used to package, transport, store, and distribute drugs, and the methods used by drug traffickers to conceal and launder the proceeds of their drug trafficking activities.

6. In addition to my training, I have had extensive experience in the investigation of the activities of drug traffickers. Since joining the DEA, I have participated in hundreds of drug investigations as a case agent and in subsidiary roles relating to the distribution of controlled

2

substances, including cocaine, cocaine base, heroin, fentanyl, marijuana, methamphetamine, and other illegal substances.  I have personally participated in almost all aspects of drug trafficking investigations, including but not limited to conducting surveillance, acting in undercover capacities, using confidential informants, executing arrest and search and seizure warrants, and conducting court-authorized Title-III wire and electronic surveillance.  I have debriefed numerous defendants, informants, and witnesses who had personal knowledge about drug trafficking activities and the operation of narcotics trafficking organizations.  I have provided sworn affidavits in support of Title-III electronic surveillance orders, search warrants, arrest warrants, and other court applications.  Through this training and experience I have gained expertise in the use of a variety of law enforcement techniques, including the application and utilization of electronic and wire interceptions, the utilization of confidential informants (CIs), the use of physical and electronic surveillance techniques.

7. Through my training and experience I have become familiar with the manner in which drug traffickers smuggle, transport, store, and distribute narcotics, as well as how they collect and launder drug proceeds.  I am familiar with the manners and methods by which drug traffickers package and prepare narcotics for transportation and distribution, their methods of operation, and security measures which are often employed by drug traffickers to avoid vulnerability to law enforcement and to other drug dealers, who might attempt to steal their drugs, their profits, and/or their customers.

8. I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports given to me by other law enforcement officers.  Since this affidavit is being submitted for the limited purpose of establishing that probable cause exists to support the issuance of a search warrant, I have not included details

about every aspect of the investigation. While this affidavit contains all the material information I am aware of that is pertinent to the requested search warrant, it does not set forth all of my knowledge about this matter.

### IDENTIFICATION OF THE DEVICES TO BE EXAMINED

9. The property to be searched is a black Apple iPhone, hereinafter "Device 1," a silver Apple iPhone, hereinafter "Device 2," a black apple iPhone, hereinafter "Device 3," a silver Apple iPhone, hereinafter "Device 4," and an Apple iPad Mini, hereinafter "Device 5" (collectively, the "Devices"). Agents are not yet able to determine the serial numbers or telephone numbers of any of the devices because they remain locked. The Devices are currently located in secure evidence storage at the Rockingham County Sheriff's Office, 101 North Road, Brentwood, NH.

10. The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

### PROBABLE CAUSE

11. Based upon information obtained from a March 2021 investigation initiated by the Rockingham County Drug Task Force (RCDTF) which included a confidential source (CS-1), physical surveillance, and controlled purchases of drugs, I believe that CHAMBERS is actively involved in the distribution of large quantities of Hash Oil in the State of New Hampshire. This information was relayed to me by members of the RCDTF.

12. CS-1 began cooperating with the RCDTF in February 2020 for the benefit of consideration regarding pending charges. CS-1 has been charged with sale of marijuana and reckless operation (motor vehicle) in the past. CS-1 has worked with RCDTF for consideration

on those charges and has not worked as a paid informant. CS-1 has not been convicted of any criminal offenses.

13.  CS-1 has not been paid or received any benefit from DEA. CS-1 is unknown to DEA and has never provided information to DEA in the past.

14.  On March 8, 2021, the RCDTF utilized CS-1 to purchase two grams of hash oil from CHAMBERS for $110 US currency in Lee, New Hampshire. CS-1 and CHAMBERS communicated utilizing a Snapchat application on a cellular phone to set up the deal. At approximately 1:00 p.m. on the same date, CHAMBERS drove to the deal location (a parking lot) in a red Ford Fusion, met with CS-1, and conducted the drug transaction, which was witnessed and documented by the RCDTF. The hash oil was contained within two small glass jars.

15.  On March 16, 2021, the RCDTF utilized CS-1 to purchase one gram of what CS-1 indicated was a more potent form of hash oil than that purchased on March 8th for $110. CS-1 communicated with CHAMBERS utilizing a Snapchat application to set up the deal. On the same date, CHAMBERS met with CS-1 and conducted the drug transaction, which was witnessed and documented by the RCDTF. RCDTF observed CHAMBERS depart from his residence in Lee, New Hampshire in the same red Ford Fusion and travel to the deal location. The hash oil was contained within one small glass jar.

16.  On March 22, 2021, the RCDTF utilized CS-1 to purchase two grams of hash oil for $110 US currency. CS-1 contacted CHAMBERS utilizing a Snapchat application to set up the deal. On this same date, CHAMBERS met with CS-1 and conducted the drug transaction, which was witnessed and documented by the RCDTF. RCDTF observed CHAMBERS depart

from his residence in Lee, New Hampshire in the same red Ford Fusion as the prior controlled purchases, and travel to the deal location. The hash oil was contained within two small glass jars.

17. On March 23, 2021, the RCDTF obtained a State of New Hampshire search warrant for CHAMBERS' residence located at  in Lee, New Hampshire along with the vehicle CHAMBERS had driven during the controlled purchases. RCDTF also obtained a State of New Hampshire arrest warrant for CHAMBERS.

18. On March 24, 2021, CHAMBERS was placed under arrest and Device 1 was seized from within the vehicle he was driving: the same red Ford Fusion that he had driven during the three controlled purchases. Device 1 was the only cellular device in the vehicle at the time of the traffic stop and was located in the center console of the vehicle. CHAMBERS had a glass jar of hash oil in the vehicle similar to those CS-1 had purchased from CHAMBERS.

19. A search warrant was also executed by the RCDTF on this date at CHAMBERS' residence at  Lee, New Hampshire. Law enforcement's search of the residence pursuant to the warrant resulted in the seizure of approximately two (2) pounds of Hash Oil, approximately five (5) pounds of Marijuana, $120,748 U.S. currency, and a large quantity of THC infused candy bars and candies from the residence. Device 2, Device 3, Device 4, and Device 5 were all seized from CHAMBERS' bedroom during execution of the warrant. RCDTF identified CHAMBERS' bedroom by his high school diploma and other items in the room with his name on them. Devices 2, 3, and 4 were found by the RCDTF in CHAMBERS' bedroom closet along with the approximately five (5) pounds of marijuana and $120,748 U.S. currency. All evidence was collected by the RCDTF.

20. On March 24, 2021, RCDTF contacted me regarding a suspected hash oil extraction lab located during execution of the warrant. I have extensive training and experience

dealing with clandestine hash oil extraction laboratories and manage a team that specializes in identifying and dismantling them. Hash oil extraction labs can be highly volatile and pose a significant risk of fire or explosion. I responded to the residence where I was met by RCDTF members. I observed items commonly used to manufacture hash oil such as a large number of butane gas canisters, dab swabs, glass jars, and other paraphernalia. A Hash Oil Rosin Extractor was seized by RCDTF which is used in the extraction of hash oil.

21. Through my training and experience in drug trafficking investigations, I have become familiar with the manner in which drug traffickers communicate by wire, often by telephone and Short Message Service (commonly referred to as text messaging). I know that individuals who distribute narcotics often utilize cellular telephones, and the text messaging capability included within their cellular telephones, as a method by which to arrange narcotics transactions.

22. Drug traffickers often carry smartphones or smart devices (such as iPads) in order to use applications including instant messaging applications (or "Apps") including SnapChat and "WhatsApp," which use the Internet to send text messages. Such Apps gained popularity with drug traffickers because it has been historically difficult for law enforcement to intercept messages sent through them. Drug traffickers use other apps like the GPS applications that may include evidence of their drug-related travels. Phones and apps can also store photos and financial information.

23. I know that smart devices such as cellular phones and iPads can contain substantial evidence about a drug trafficker's activities. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages. Actions such as

internet searching or emailing (in addition to calling) and text messaging can now be performed from many cell phones. In addition to communications (in Apps like Snapchat and WhatsApp, over text messages, or through call history), they may also contain photographs and videos of drugs, drug activities, or drug associates, location data that could shed light on where traffickers meet customers or suppliers or locations of stash houses, contact lists, ledgers, and other evidence. Finally, cellular phones and iPads may contain records of financial transactions and/or accounts where drug proceeds are stored. I know, based on my training and experience, that people who deal in drugs like hash oil often have large amounts of cash and may need to launder that money in order to facilitate their business or hide the illicit nature of their incomes. Evidence of how they do this may be on their personal electronic devices and may be stored on those devices.

24. Based on my training and experience, I know that drug traffickers often possess multiple telephones and can be known to change their telephones frequently to avoid detection by law enforcement. In addition, drug traffickers sometimes compartmentalize how they use phones. For example, they may use one telephone to speak to drug customers and another phone that they reserve for their dealers or trusted associates. I also know that older phones that drug traffickers may have rotated out in use of new ones, could nevertheless contain evidence of drug trafficking including previous drug contacts, and could shed light on the length of time someone has been dealing drugs.

25. Based on the facts set forth in this affidavit, I submit that there is probable cause to believe, and I do believe, that violation of 21 U.S.C. §§ 846 and 841(a)(1) (conspiracy to distribute and possess with intent to distribute controlled substances) have been committed by

CHAMBERS. I submit that there is probable cause to believe, and I do believe, that the information described in Attachment B will constitute evidence of these criminal violations.

26. Due to the large amount of cash recovered from CHAMBERS' bedroom and large volume of hash oil seized, I believe that CHAMBERS may have engaged in this activity for some time. Therefore, I seek to search for evidence from Jan 1, 2020 to the present.

27. The Devices are currently in the lawful possession of the Rockingham County Drug Task Force (RCDTF). Device 1 was seized incident to arrest when CHAMBERS was arrested on March 24, 2021, and the other devices were seized during execution of the search warrant at CHAMBERS' residence on the same date.

28. The Devices are currently in secure evidence storage at the Rockingham County Sheriff's Office located at 101 North Road, Brentwood, New Hampshire. In my training and experience, I know that the Devices have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the RCDTF.

## TECHNICAL TERMS

29. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call

log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media.

Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data

and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

30. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at http://www.appl.com/iphone-12/specs/, I know that the Devices have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, PDAs, and to access the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, evidence of communications between the users and others, and location information, and other data that may be evidence of conspiracy to distribute or manufacture and possess with intent to distribute or manufacture controlled substances.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

31. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

32. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review

      team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

      33.  *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

      34.  *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

35.  I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

I declare that the foregoing is true and correct.

/s/ Michael J. Lecuyer
Michael J. Lecuyer, Special Agent
United States Drug Enforcement Administration

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: May 10, 2021
Time: 5:56 PM, May 10, 2021

/s/ Andrea K. Johnstone
HONORABLE ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

The property to be searched is as follows: a black Apple iPhone with a black case ("Device 1"); a silver Apple iPhone ("Device 2"); a black Apple iPhone ("Device 3"); a silver Apple iPhone ("Device 4"); and a white Apple iPad mini ("Device 5") (collectively, "the Devices"). Agents are not yet able to confirm the respective phone numbers and serial numbers of the Devices because they remain locked. The Devices are currently located in secure evidence storage at the Rockingham County Sheriff's Office, 101 North Road, Brentwood, NH.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1. All records on the Devices described in Attachment A that relate to violations of **21 U.S.C. §§ 841(a)(1) and 846,** and involve **CHAMBERS** since **January 1, 2020**, including:

    a. Information associated with drug trafficking, including pay-owe sheets, buyer lists, telephone lists, address books, seller lists, ledgers, records of sales, records of expenditures made to purchase controlled substances, and records of expenditures to purchase products which are used in the distribution of controlled substances

    b. lists of customers and related identifying information;

    c. types, amounts, and prices of controlled substances trafficked as well as dates, places, and amounts of specific transactions;

    d. any information related to sources of controlled substances (including names, addresses, phone numbers, or any other identifying information);

    e. any information involving travel to obtain controlled substances or the transportation of controlled substances;

    f. information reflecting contact or communication with coconspirators, the distribution of controlled substances to coconspirators, and the disposition of proceeds of controlled substances (including within messaging applications like WhatsApp, Snapchat, and Instagram stored on the phone);

    g. all bank records, checks, credit card bills, account information, and other financial records.

2.      Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.